IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICHARD SUTTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-67-GMS |
| | ) | |
| CITY OF WILMINGTON, | ) | |
| DEPARTMENT OF POLICE | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

### I. INTRODUCTION

The plaintiff, Richard Sutton ("Sutton"), filed a Complaint (D.I. 1.) against the City of Wilmington, Department of Police ("City") on January 23, 2012. (*Id.*) In his Amended Complaint, Sutton alleges claims for race discrimination and age discrimination under 19 *Del. C.* § 701 and 42 U.S.C. § 1981. (D.I. 4, ¶¶ 30, 34.) On June 17, 2013, following completion of discovery, the City filed a motion for summary judgment asserting that Sutton's age and race discrimination claims fail because: (1) his 2009 claims are barred by the statute of limitations; (2) he failed to exhaust his administrative remedies regarding his 2010 and 2011 claims; and (3) he cannot establish a prima facie case of discrimination or prove that City's articulated reasons for its actions were pretextual. (D.I. 40 at 6.) The City also argues that Sutton's claim under § 1981 fails because he has not alleged or demonstrated "a custom, policy, practice, or procedure for racial discrimination." (*Id.*) For the reasons that follow, the court will grant the City's motion for summary judgment.

## II. BACKGROUND

The following facts are taken from Sutton's First Amended Complaint and, where indicated, relevant deposition statements and exhibits. (D.I. 4.)

Sutton is a 56-year old African-American male who was hired by the City in 1986 as a police officer in the Wilmington Police Department. (D.I. 4, ¶ 3.) From 1997 to 2005, Sutton was employed by the City as a K9 handler in the K9 Unit. (*Id.*; D.I. 40 at 6–7.) Sutton was assigned three dogs during that time. In 1997, Sutton was assigned to his first K9, Akita, who was retired after a few years. (D.I. 40, Appendix "A" at 6, 9–10.) Sutton was later assigned another K9, Fido. (A7.) Fido had to be retired after three months because Sutton had "difficulties properly training [him]." (*Id.* at 15; D.I. 41, ¶ 7.) In 2005, Sutton was assigned to his third and final dog, Kazon. (D.I. 41, ¶ 5.) Sutton's supervisor testified at his deposition that Sutton did not properly exercise and train Kazon. (*Id.*) The dog had to be retired as a result. (*Id.*) Sutton's improper training of Kazon cost the police department approximately $3,500—the amount paid for the dog. (*Id.*, ¶ 6.) Sutton voluntarily requested a transfer out of the K9 Unit in 2005. (*Id.*, ¶ 3.) Sutton has worked as a house "turnkey"—a desk position stationed at the City prison—since 2005. (A11.)

On August 11, 2009, Wilmington Chief of Police, Michael Szczerba ("Szczerba"), posted a bulletin announcing two available positions in the K9 Unit. (A69–70.) Sutton was one of nine officers who requested consideration for the position. (A71–88.) Four of the nine candidates were ultimately considered for the two positions: Dan Moore ("Moore"), Ryan Dorsey ("Dorsey"), Scott Gula ("Gula"), and Sutton. (*Id.*, A14 at 53.) The evaluation process consisted of a home visit, background check, physical testing, and an interview panel. (A149.) The interview panel consisted of Lieutenant Carolyn Henry ("Henry"), Captain Victor Ayala

("Ayala"), and Corporal Mark Tobin ("Tobin"). (A12 at 48.) Master Corporal Donald Witte ("Witte") was present for the interview, but did not take an active role in the interview process and was not involved in the decision-making process. (A13.) Sutton scored well on the home visit and background check, but struggled with the physical testing and received the lowest interview score. (A95, A97, A156–58, A113.) Moore and Dorsey received the two highest scores. (D.I. 4, ¶ 9.) They were offered and accepted the positions. (*Id.*, ¶¶ 9–10.)

On or around October 2, 2009, Sutton was informed by Henry that he was not selected for the position. (D.I. 40, A15.) Sutton alleges that Henry told him he "was not the right fit; the Unit is going in a different direction" and that she "did not see [him] staying ambitious on the street for the next five years." (D.I. 4 at ¶ 11.) Witte told Sutton that he believed Sutton had not been selected for the K9 handler position because of his age. (A17, A159–61.) Sutton filed a formal grievance to the City in November 2009, alleging that his non-selection for one of the K9 Handler positions was discriminatory. (D.I. 4, ¶ 14; D.I. 49 Ex. 22.) The City denied Sutton's grievance on the grounds that it was untimely. (D.I. 4, ¶ 15.) Henry informed Sutton that no alternates were selected for the position.[1] (*Id.*, ¶ 18.) If an alternate had been selected in 2009, it would have been Gula because he had the next highest score. (A58–59.)

Dorsey was relieved from the K9 Unit later in 2009 due to internal affairs issues. (A67–68.) His position was not immediately filled. (*Id.*) On April 23, 2010, Szczerba posted a vacancy for the vacant K9 handler position. (A200–01.) Sutton chose not to apply for the position. (A17–18.) Gula and Corey Brown ("Brown") applied and were tested using substantially the same testing methods as during the 2009 vacancy. Brown was approved for the position and Gula was listed as an alternate. (A236, A54–55, A60–61.) Brown was transferred

---

[1] Henry was approached by a representative from the Fraternal Order of Police ("FOP"), Mike Lawson ("Lawson"), about the use of alternates. (D.I. 40, A55.) Lawson asked Henry if she would consider selecting alternates in the future. (*Id.*, A56.) She agreed to consider the use of alternates for future vacancies. (*Id.*)

3

to the K9 unit on August 9, 2010, and was given a K9. (A237.) In 2011, K9 handler Richard Press ("Press") was transferred out of the K9 unit. (A239.) Gula was transferred to the K9 Handler position because he had been approved as an alternate.[2] (A238–40.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). There is a genuine issue "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* When determining whether a genuine issue of material facts exists, the district court must view the evidence in the light most favorable to the nonmoving party and draw inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citing FED. R. CIV. P. 56(e)).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* The party opposing summary judgment must present

---

[2] Henry decided to select an alternate K9 Handler for the first time in 2010. (A57, A63–64.)

4

more than just "mere allegations, general denials, or . . . vague statements" to show the existence of a genuine issue. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). As such, a nonmoving party must support their assertion that a material fact is in dispute by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

Sutton filed race and age discrimination claims under the Delaware Discrimination in Employment Act ("DDEA") and under § 1981. The City alleges that Sutton's age and race discrimination claims fail as a matter of law because (1) his 2009 claims are barred by the statute of limitations; (2) he failed to exhaust his administrative duties regarding his 2010 and 2011 claims; and (3) he cannot establish a *prima facie* case of discrimination.

### A. Sutton Failed To Exhaust His Administrative Remedies Concerning His Claims Regarding Events in 2010 and 2011

A plaintiff must exhaust his administrative remedies prior to asserting a private cause of action under the DDEA. 19 *Del. C.* § 714; *see also* 42 U.S.C. § 2000e–16(c) (a plaintiff may not file a Title VII suit in federal court without first exhausting all avenues for redress at the administrative level). This prerequisite, akin to a statute of limitations, mandates dismissal of a Title VII claim if a plaintiff files the claim before receiving a right to sue notice. *See Story v.*

*Mechling*, 214 Fed. App'x 161, 163 (3d Cir. 2007) (plaintiff may not proceed with Title VII claim because he neither received a right to sue letter nor submitted evidence indicating that he requested a right to sue letter); *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001). A plaintiff may not seek relief in federal court for his Title VII claim without first affording the Equal Employment Opportunity Commission ("EEOC") an opportunity to review and conciliate the dispute. *Id.* at 470. The administrative prerequisites require a plaintiff to first lodge a complaint with either the EEOC or the equivalent state agency responsible for investigating claims of employment discrimination. *See* 42 U.S.C. § 2000e–5(e). In Delaware, the equivalent state body is the DDOL. If the EEOC or equivalent state agency determines not to pursue a plaintiff's claims and issues a right-to-sue letter, only then may a plaintiff file suit in court. *See* 42 U.S.C. § 2000e–5(f)(1). Claims brought under Title VII must be filed within ninety days of the claimant's receipt of the EEOC right to sue letter. *Id.*

The City asserts that Sutton's charge of discrimination alleges he was discriminated against on the basis of age and race when he was not selected for the K9 handler position in 2009 but does not include allegations concerning the 2010 and 2011 positions.[3] (D.I. 40 at 9; A1) As a result, his claims based on the 2010 and 2011 actions were never processed by the EEOC.[4] (*Id.*, A2.)

Sutton argues that the issues surrounding the 2010 and 2011 transfers did not need to be separately investigated by the EEOC because they are issues that were "reasonably expected to grow out of the charge of discrimination." (D.I. 48 at 12.) The parameters of the civil action in the district court are defined by the scope of the EEOC investigation, which can reasonably be

---

[3] In his Answering Brief (D.I. 48), Sutton concedes his age and race discrimination claims under 19 *Del. C.* § 711 concerning his failure to obtain the K9 handler position in August 2009 are barred by the statute of limitations.

[4] Sutton's initial EEOC claim alleged discrimination for the 2009 action. He later added allegations concerning the 2010 vacancy and 2011 only after he had been given a Right to Sue letter for the 2009 claim. (*See* A1–3.)

expected to grow out of the charge of discrimination. *See Webb v. City of Phila.*, 562 F.3d 256, 263 (3d Cir. 2009). Here, however, the alleged discrimination in 2010 and 2011 fall outside the scope of the 2009 investigation. Sutton did not to apply for the 2010 vacancy in the K9 Unit even though he was aware that there was a hiring opportunity. (A17, A202.) When Henry informed Sutton that he did was not selected for the K9 Handler position in 2009, she also told him that the selection process did not choose alternates. (A15–16.) Therefore, the only way that the 2010 K9 Unit vacancy could have been filled was through the hiring process, of which Sutton was aware. (A17.) The 2011 claim also falls outside the scope of the 2009 claim and would not have been expected to grow out of the original charge of discrimination. Therefore, the court concludes that Sutton did not exhaust his administrative remedies for either the 2010 or 2011 charges.

### B. Sutton Failed To Establish A Prima Facie Case Of Age Or Race Discrimination

Though the tests are not identical, establishing a *prima facie* race or age discrimination claim requires the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse employment decision; and (4) this decision occurred under circumstances giving rise to an inference of discriminatory action. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (establishing a claim for race discrimination); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (establishing a claim for age discrimination).

Discrimination claims brought under Title VII are analyzed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972); *Shahin v. Delaware*, C.A. No. 07-644-GMS, 2010 WL 4975653, at *4 (D. Del. 2010); *Berry v. Delaware*, C.A. No. 06-217-GMS, 2008 WL 906104, at *2–3 (D. Del. 2008). Under

7

this framework, a plaintiff is required to first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this burden, the burden then shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its actions. *Id.* at 802–03. If such a reason is articulated, the plaintiff is then required to demonstrate that the defendant's asserted rationale is pretextual. *Id.* at 804. If the plaintiff cannot carry this burden, the defendant is entitled to summary judgment. *Id.*

The court will examine whether Sutton suffered an adverse employment action to succeed in establishing a prima facie case before conducting the burden-shifting analysis.[5]

### C. Sutton Failed To Establish He Was Subject To An Adverse Employment Action

Sutton alleges that he suffered adverse employment actions in 2009, 2010, and 2011 because he was neither selected for nor transferred to the K9 unit. (D.I. 48 at 14.) Sutton asserts that "because he was not selected for any of those positions, Sutton incurred a loss of compensation related to the so-called "maintenance hour" that K9 officers are entitled to and the loss of overtime, resulting from K9 officers' service as part of the defendant's SWAT Unit." (*Id.* at 14–15.) Adverse action by an employer that is action "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004). Further, a "purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *See Swain v. City of Vineland*, 457 F. App'x 107, 110 (3d Cir. 2012) (citing *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (defining "purely lateral transfer" by one that results in no decrease in title, pay, or benefits); *see also Funayama v. Nichia Am. Corp.*, 482 F. App'x 723, 726–27 (3d Cir. 2012).

---

[5] The parties have not argued any of the remaining elements of the framework are in dispute.

8

Sutton admits an assignment into the K9 unit is not a promotion. (A19 at 78.) Both the K9 Handler and turnkey positions have forty-hour work weeks. (*Id.*) If Sutton were transferred to the K9 Unit he would not receive a salary increase. (*Id.*) Sutton claims that K9 officers receive 1.5 hours of overtime at time and a half rate on their days off to compensate for K9 care, including feedings, vet visits, and exercise. (A242.) Sutton, however, already receives overtime in his current position, sometimes as often as four hours per day three or four times per week. (A20.) There is no material factual dispute regarding the fact that the work hours, wage, and overtime opportunities available for a K9 Handler nearly mirror those of a turnkey. As such, the K9 position cannot be considered a promotion. Accordingly, Sutton did not satisfy his *prima facie* case for race or age discrimination because he was not subjected to an adverse employment action.

### D. The City Proffered A Legitimate, Non-Discriminatory Reasons for Sutton's Non-Selection

Assuming for the sake of completeness that Sutton could establish a *prima facie* case of discrimination, the burden would then shift to the City to articulate one or more legitimate, nondiscriminatory reasons for its actions. *Shahin*, 2010 WL 4975653, at *4. The 2009 transfer process to the K9 Unit included physical testing, background check, home visit, and interview in front of a panel. (D.I. 4 at 2.) Sutton passed the physical testing, home visit, and background checks, but received the lowest score on the interview. (A95, A97, A156–58, A113.) Henry, who served on the interview panel, testified that Sutton did not score as well in the "preparedness" category of the interview. (A43-44, A169-70.) The "preparedness" category considered the candidate's pre-application actions, including if he had attended K9 Unit training, assisted by taking bites from the dogs during training, shown interest in the K9 Unit to, or talked to any officers in the unit. (*Id.*) There is no evidence that Sutton performed any of these actions

9

to demonstrate preparedness in the K9 Unit, either during the application process or at any time after he transferred out of the K9 Unit in 2005. (A45–46.) Henry explained that Sutton did not express responses to hypothetical scenarios well and instead just assumed the panel knew how he was supposed to respond. (A47.) Rather than demonstrating interest and enthusiasm for the position, Sutton simply "relied on his prior K9 experience as an entitlement to hold the new position." (*See* D.I. 40 at 4.) Ultimately, the two vacant K9 positions in 2009 went to the first and second highest-scoring applicants one of whom was African American, Moore and Dorsey, respectively. (*Id.*) Sutton provides no evidence to support his assertion that the application process is discriminatory. (A198.)

Sutton also asserts that he was again discriminated against in 2011 when Gula, a Caucasian officer, was selected for a newly open position in the K9 Unit. (*See* D.I. 48 at 15–16.) According to the City's policy, a candidate must apply for an open position to be considered for the vacancy. (A181.) Furthermore, though the Third Circuit has ruled that the failure to formally apply for a job will not necessarily bar a Title VII plaintiff from establishing a discrimination case, the law requires that the plaintiff must make every reasonable attempt to convey his interest in the job to the employer. *See Murray v. Beverage Distribution Center*, 533 F. App'x 98, 102 (3d Cir. 2013) (citing *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990). Sutton conceded that he did not apply in 2010, nor did he present any evidence to show that he conveyed his interest in the position. Neither Sutton's race nor age could have been factors for a job for which he did not even apply or convey any interest in applying. Furthermore, because Sutton was not selected as an alternate during the 2010 process, neither his race nor age were determinative in his non-selection to transfer to the unit in 2011. Therefore, the City had a legitimate rationale for not transferring Sutton in 2009, 2010, and 2011.

10

**E. Sutton Provided Insufficient Evidence To Allow A reasonable Factfinder To Conclude The City's Legitimate Non-Discriminatory Rationale Was Pretextual**

The City proffered a legitimate, non-discriminatory reason for Sutton's non-selection, so the burden must shift back to Sutton to demonstrate that the City's rationale was pretextual to survive summary judgment. *See Shahin*, 2010 WL 4975653, at *4. To do so, Sutton must provide sufficient evidence to allow a reasonable factfinder to conclude that the City's proffered reasons for not hiring him are a pretext for illegal discrimination. (*Id.*) Sutton may meet this burden by providing evidence that he would allow a factfinder reasonably to (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action. *See Sarullo*, 352 F.3d at 800-801 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The court concludes that Sutton has not demonstrated sufficient evidence of pretext of either claim to survive summary judgment.

Sutton asserts that the City's rationale is pretextual because the City had a history of discrimination against African American officers. (D.I. 48 at 16.) The record does not support that assertion. Sutton testified that he was not aware of any policies, procedures, or customs of race discrimination in the City. (A21.) Two of the four officers that were moved up to the K9 Unit in the relevant years were African American: Dorsey in 2009, and Brown in 2010. (D.I. 40, A14; A202–35.) Importantly, Sutton himself served as a member of the K9 Unit for nine years, and was relieved only when he voluntarily transferred to his current position. (D.I. 4, ¶ 2.)

Sutton also claimed that Dwayne Cottingham ("Cottingham"), Anthony Bowers ("Bowers"), and Dorsey each applied for transfers, but were not chosen because of their race. (A22 at 114.) Cottingham did apply in 2008 to be a School Resource Officer ("SRO"), but the department chose Daniel Martinez ("Martinez") instead. (D.I. 41, ¶ 10.) Martinez is also a

minority male. (*Id.*) A reassignment from turnkey to SRO would also be a lateral transfer rather than a promotion. (*Id.*) Similarly, Bowers was transferred to the Federal Marshall's Office, and then transferred again to the Special Operations Division and is currently an SRO. (*Id.*, ¶ 9.) As discussed previously, Dorsey applied and was chosen for the K9 Unit in 2009. (*Id.*, ¶ 8.)

Sutton also failed to satisfy the burden to prove the City's rationale was pretextual as to his age discrimination claim. Sutton alleges that Henry's telling him she "did not see him staying ambitious on the street for the next five years" signaled discrimination about his age. (D.I. 4, ¶ 11.) Sutton also points to a comment on the K9 Selection Process document that points out that his age may be a "liability." (A202.) However, the City asserts that these comments were mainly in reference to Sutton's failure to properly train the dogs in his previous years as a K9 Handler. (D.I. 40 at 17.) Indeed, comments on other K9 Selection Process documents are wary of Sutton's history in the unit. (*Id.*, A102–03.) One document questions Sutton's ability to meet the physical demands of the job, discusses Sutton's previous K9 Handler shortcomings that "will not have changed," and concludes that Sutton's likely inability to coax a dog's "play and prey drive" would be unfair to a K9 partner. (*Id.*)

Sutton also asserts that Witte's comment to Sutton about his age after the 2009 interview reflected the panel's decision to not hire Sutton due to his age. (A17, A159–61.) However, comments by individuals outside of the decision-making chain are stray remarks which, standing alone, are inadequate to support an inference of discrimination. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997). Witte was not a decision maker concerning the selection of the K9 Handler, and concedes that his comment was based on his personal opinion.

(A13, A161.) Sutton pointed to no evidence in the record to establish the City's rationale was pretextual.[6] The court concludes that summary judgment in favor of the City is appropriate.

## V. CONCLUSION

For the foregoing reasons, the court grants the City's motion for summary judgment. (D.I. 39.)

Dated: August 21, 2015

UNITED STATES DISTRICT JUDGE

---

[6] The court also finds no evidence in the record to support Sutton's claim that the City has a policy or custom of race discrimination.